**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53584-0-II |
| Appellant, | (consolidated with) |
| v. | |
| DAMION RAY BIRGE, | |
| Respondent. | |
| STATE OF WASHINGTON, | No. 53594-7-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| JESSE L. JAHNER, | |
| Respondent. | |

GLASGOW, J.—RC left KJC, her nine-year-old grandchild who had severe psychiatric issues and cognitive disabilities, with two social workers while she ran a brief errand. KJC then locked the social workers out of the house, broke windows, and grabbed kitchen knives. One of the social workers called 911 out of concern for KJC's safety. Before law enforcement arrived, RC returned. She disarmed and calmed KJC.

Two police officers, Damion Ray Birge and Jesse L. Jahner, then arrived and encouraged RC to discipline KJC by striking him with a belt. RC initially resisted but eventually struck KJC more than 20 times with a belt while one of the officers allegedly held the child down. KJC was then transported to the hospital due to cuts on his hand and for psychiatric treatment. The next day, medical staff discovered bruises on KJC's back, sides, and arms, and they notified police.

After the Tacoma Police Department and the Washington State Patrol (WSP) investigated, the State charged Birge and Jahner with third degree assault of a child both as principals and as accomplices. The State also charged them with official misconduct. Birge and Jahner moved to dismiss the charges under CrR 8.3(c) and *State v. Knapstad*.[1] The trial court granted their motions and dismissed both charges.

The State appeals, arguing that the evidence, viewed in the light most favorable to the State, was sufficient to proceed to a jury trial on third degree assault and official misconduct. The defendants counter that the trial court properly dismissed the third degree child assault charges because, as a matter of law, the State could not prove that they had the requisite mental state. Defendants also argue that the evidence was insufficient to proceed to trial on the official misconduct charge and, alternatively, the official misconduct statute is unconstitutionally vague and overbroad.

Viewing the evidence in the light most favorable to the State, the State has presented sufficient evidence to establish a prima facie case of guilt of both third degree assault and official misconduct, even if some facts are in dispute. Moreover, the official misconduct statute is not unconstitutionally vague or overbroad. We reverse the trial court's dismissal of both charges and remand for proceedings consistent with this opinion.

FACTS

A.      Background

In 2017, nine-year-old KJC lived with his maternal grandmother, RC, who had adopted him. KJC was cognitively disabled and suffered from oppositional defiance disorder, posttraumatic stress disorder, fetal alcohol spectrum disorder, attention deficit hyperactivity disorder, and

---

[1] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

psychosis. KJC had been hospitalized five times in the previous three months due to his behavioral issues, which included threats of violence toward his grandmother. KJC regularly received counseling from Catholic Community Services caseworker Meluleki Ncube. Catholic Community Services staff also helped RC with caretaking.

B.      Incident Leading to KJC's Hospitalization

Ncube and another caseworker, Michelle Straling, were at RC's house. RC left to pick up medications from a pharmacy across the street while Ncube and Straling stayed with KJC. While RC was gone, KJC locked Ncube and Straling out of the house. Ncube attempted unsuccessfully to get KJC to unlock the door. KJC then started screaming and yelling, breaking windows, and throwing dishes. He was holding at least one knife. Ncube called 911 because he was concerned for KJC's safety.

RC returned before law enforcement arrived. She unlocked the door and convinced KJC to drop the knives. KJC was sitting calmly on the couch when two Tacoma Police Department officers, Birge and Jahner, arrived. Birge and Jahner had previously responded to an incident involving KJC and had helped transport him to the hospital for mental health treatment.

Between the officers' arrival and when they transported KJC to the hospital, RC hit KJC on the buttocks, back, and arms with a looped over belt at least 20 times in the presence of Ncube and Straling. The record contains conflicting descriptions about who instigated the spanking with the belt and how it occurred.

C.      Jahner's Initial Report

According to Jahner's initial report, RC told Jahner and Birge as soon as they arrived that KJC had hurt her before and KJC had been involuntarily committed several times. Jahner stated KJC began to act "defiant," kicking and punching RC, throwing a toy at her head, and calling her a "f***ing b**** that will die." Clerk's Papers at 2. Jahner said that RC told the officers she feared

3

for her life. Jahner explained that KJC was transported to Mary Bridge Children's Hospital to treat the cuts on his hands. Jahner's initial police report never mentioned that RC struck KJC with a belt, nor did it indicate that any discussion of physical discipline occurred.

D.      Hospital Report

KJC stayed overnight at the hospital. The next morning, medical staff noticed that KJC had "marks [on his] back, sides, and arms." Suppl. Clerk's Papers (SCP) at 291. When a nurse asked KJC what happened, he said that his grandmother hit him with a belt. KJC reported mild pain on his low back when touched. An emergency room doctor examined KJC, observing and photographing "multiple linear marks consistent with belt marks to his bilateral arms, sides, and back." SCP at 297.

A hospital social worker, Cobi Silver, separately contacted Ncube and RC. Ncube told Silver that "the officers told the grandmother to get a belt and discipline [KJC]." SCP at 293. Ncube reported that one of the officers struck the table with the belt to demonstrate how to hit KJC and instructed RC to "'do it now to [KJC].'" *Id.* Similarly, RC told Silver that the officers told her to get a belt when they arrived, which she did because she initially "thought they 'didn't want to use handcuffs on a kid.'" *Id.* RC reported that Birge and Jahner "told her that they [would] not help her or call [emergency medical services] unless she beat[] [KJC] with the belt." *Id.* RC said that she had promised KJC she would never hit him, but she felt pressured to do so by the officers.

E.      Tacoma Police Department Investigation

Silver, the hospital social worker, contacted the Tacoma Police Department to report the bruising on KJC's body. Officer James Pincham saw the bruises and noted that KJC had eight bruises and one abrasion. Pincham spoke to RC, who told him that on the day of the incident, the officers asked if she ever physically disciplined KJC, and she said she did not. RC explained that Birge and Jahner then yelled at her to get a belt. She reported that she hit KJC with the belt only

4

because Birge and Jahner told her to. RC said the officers threatened not to respond in the future and threatened not to order an ambulance to transport KJC to the hospital that day unless she hit KJC with the belt. According to RC, Birge and Jahner "instructed [her] to hit [KJC] for every window that he broke," and Jahner said, "'[W]e ask people to do things once, and then we make them do it.'" SCP at 301, 303.

Pincham also interviewed Ncube, who confirmed that the officers asked RC if she physically disciplined KJC and told RC that she was legally entitled to physically discipline KJC. Ncube stated that Birge told RC to "'beat the demons' out of [KJC]." SCP at 301.

F.      Jahner's Supplemental Report

At the request of his superior, Jahner completed a supplemental report. In it, Jahner stated that RC told the officers when they arrived that she was afraid KJC could seriously hurt her. The officers then asked RC if she had ever physically disciplined KJC. RC said she had not. Birge and Jahner then informed RC that she could use physical force to discipline her child under RCW 9A.16.100. RC was worried she would not be able to "effectively discipline" KJC because she had a back injury. SCP at 278. Birge and Jahner told RC that she could use "small items as an extension of her hand," and RC "grabbed her own belt out of her room." *Id.* Jahner said RC asked the officers to physically discipline KJC themselves, but they explained they could not legally do so.

Jahner reported that RC then gave KJC "several legal spankings with the belt" but KJC was combative. *Id.* RC struck KJC several more times as punishment for being combative, and then struck KJC again several times because he threw a toy toward her head. KJC yelled at RC that he was going to kill her. Eventually, an ambulance transported KJC to the hospital because he was threatening to kill RC and she was afraid. Jahner wrote that RC "thank[ed] us both several times." *Id.*

G.      WSP Investigation

At the request of the Tacoma Police Department, WSP detective James Meldrum interviewed RC, Ncube, and Straling and created a written report describing these interviews. Meldrum certified under penalty of perjury that he had truthfully reported the interviews.

Ncube reiterated to Meldrum that Birge instructed RC to "'beat the demons out of [KJC].'" SCP at 306. Ncube also noted that neither officer "cautioned [RC] on how hard to strike [KJC] or what limits she had with the belt." SCP at 305. Ncube recalled at least 25 strikes and thought the striking was "excessive." SCP at 306. Ncube explained that "Jahner grabbed [KJC] and held him face down exposing his buttocks." SCP at 305. Ncube also physically demonstrated how this occurred. Meldrum wrote that "Ncube became visibly upset and said 'it kept going.'" *Id.*

Ncube also reported that one of the officers asked Ncube if he had ever been struck like that as a child, to which Ncube answered "yes" because he was raised in Africa, but the laws were different where he grew up. Ncube said the officer responded, "'[I]t's the same everywhere.'" SCP at 306. Ncube also reported that Birge advised RC she could strike KJC with a belt while he slept to punish him for squirming and trying to block the blows from the belt.

Straling, the second social worker, told Meldrum that RC resisted hitting KJC for over five minutes after the officers instructed her to hit KJC. Straling thought KJC was hit about 20 times. Meldrum reported, "Straling described the incident as a 'long drawn out beating' and . . . placed a call to her supervisor while in the kitchen because she felt funny about it and couldn't stand to see it happen anymore." SCP at 307. Because the police were already involved, Straling and Ncube could not figure out what else to do. When asked if she thought the strikes were excessive, Straling responded, "'Yeah . . . if you've never spanked a kid, and you've never used a belt, you don't know how strong you're hitting them . . . . I was expecting them to say something like okay, be careful, don't hit him too hard, and they didn't.'" *Id.*

Meldrum concluded that "[p]rior to the officer[s'] arrival, [RC] . . . was able to deescalate the situation by disarming [KJC] and calming him down" and when Birge and Jahner arrived, KJC was "calmed down and seated on a couch." SCP at 309. Meldrum wrote that Birge and Jahner "escalated" the situation by "pressur[ing] [RC] to strike KJC with the belt." *Id.* Although Meldrum recognized that RC contradicted herself on some subjects, Meldrum relied on his interviews with the social workers, who were two independent witnesses, to corroborate that Birge showed RC how to use the belt on KJC and Jahner held the child down. Meldrum further concluded that the officers told RC she should hit KJC for every window he broke and the spankings resulted in bruising that was visible the next day. Based on these findings, as well as KJC's youth and disabilities, Meldrum recommended referring the case to the prosecutor's office for evaluation.

The State charged Birge and Jahner with third degree assault of a child, coercion, and official misconduct.

H.      Motion to Dismiss Under CrR 8.3(c) and *Knapstad*

Birge and Jahner filed motions to dismiss the charges under CrR 8.3(c) and *Knapstad*. They argued that there were no material issues of fact and the evidence was insufficient to establish a prima facie case of the crimes charged. Jahner also argued that the phrase "unauthorized act" in the official misconduct statute was unconstitutionally vague and overbroad.

The evidence before the trial court was the prosecutor's declaration summarizing the evidence, Birge and Jahner's initial and supplemental police reports, KJC's hospital records, and Meldrum's report summarizing his witness interviews.

Based on this evidence, material facts were in dispute. According to RC and the social workers, Birge and Jahner insisted that RC hit KJC with a belt even though RC resisted, and the officers threatened to not order an ambulance or help RC in the future unless she hit KJC with the belt. Ncube stated that Birge told RC to "'beat the demons out of [KJC]'" and to hit him in his

sleep. SCP at 306. The social workers also stated that Birge and Jahner never cautioned RC how hard to hit KJC. RC and the social workers said that Jahner held KJC down while RC hit him.

Birge and Jahner maintained that they merely informed RC that she had a legal right to physically discipline KJC. They stated it was RC's idea to hit KJC with a belt. Jahner's report did not indicate that either officer held KJC down or otherwise facilitated the beating. Jahner's report also made no mention of any comments about withholding additional or future help, "'beat[ing] the demons out of [KJC],'" or hitting KJC while he slept. *See id.*

The trial court granted Birge's and Jahner's motions and dismissed both counts. The State appeals the trial court's ruling.

ANALYSIS

I. THIRD DEGREE CHILD ASSAULT CHARGES

The State argues that the trial court erred by granting the defendants' motions to dismiss the third degree child assault charges because, taking the evidence in the light most favorable to the State, a reasonable trier of fact could have convicted Birge and Jahner of that offense. The State contends the trial court erred by ruling that the only possible inference from the evidence was that Birge and Jahner intended for RC to lawfully discipline KJC in accordance with the parental discipline statute. The State asserts that the trial court misapplied the CrR 8.3(c) standard by failing to draw all rational inferences in favor of the State, by considering the parental discipline statute as an affirmative defense, and by improperly resolving factual issues. We hold that the trial court erred when it dismissed the third degree child assault charges.

A.      Motion to Dismiss Under CrR 8.3(c) and *Knapstad*

A defendant may move before trial to dismiss a charge if no material facts are disputed and the undisputed facts do not support a prima facie case of guilt for the crime charged. CrR 8.3(c); *Knapstad*, 107 Wn.2d at 352. "*Knapstad* created a pretrial process akin to summary judgment,"

when considering whether undisputed facts establish a prima facie case of guilt. *State v. Graham,* 182 Wn. App. 180, 182, 327 P.3d 717 (2014). "The threshold showing required for a prima facie case (and thus to survive a *Knapstad* motion to dismiss) is lower than that required for a conviction. Nonetheless, the State must provide at least some evidence supporting each element of the crime charged to merit consideration by a jury." *State v. Montano,* 169 Wn.2d 872, 879, 239 P.3d 360 (2010). We must affirm a "dismissal under *Knapstad* if no rational fact finder could have found the essential elements of the crime." *State v. O'Meara,* 143 Wn. App. 638, 641, 180 P.3d 196 (2008).

"If material factual allegations in the motion are denied or disputed by the State, denial of the motion to dismiss is mandatory." *Knapstad*, 107 Wn.2d at 356. At least one Washington court has held that the existence of a meritorious defense is not relevant under *Knapstad*. *State v. Groom*, 80 Wn. App. 717, 723, 911 P.2d 403 (1996).

Similarly, CrR 8.3(c)(1) provides that in seeking dismissal, the defendant must "alleg[e] that there are no material disputed facts." In response, the State "may submit affidavits or declarations in opposition to [the] defendant's supporting affidavits or declarations." CrR 8.3(c)(2). Both the defense and the State may attach additional information, such as police reports, witness statements, or "other material" for the trial court to consider in ruling on the motion to dismiss. CrR 8.3(c)(1)-(2). CrR 8.3(c)(3) requires the trial court to "view all evidence in the light most favorable to the prosecuting attorney" and "make all reasonable inferences in the light most favorable to the prosecuting attorney." The rule also prohibits the trial court from "weigh[ing] conflicting statements" or "bas[ing] its decision on the statement it finds the most credible." CrR 8.3(c)(3).

"The court shall grant the motion if there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt." *Id.* We review the trial court's ruling de novo. *State v. Barnes*, 189 Wn.2d 492, 495, 403 P.3d 72 (2017).

B.      Third Degree Assault of a Child

Under RCW 9A.36.140(1), a person can be convicted of third degree assault of a child if the person commits assault as defined in RCW 9A.36.031(1)(d) against a child. Under RCW 9A.36.031(1)(d), a person is guilty of an assault if "[w]ith criminal negligence [they] cause[] bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm." Criminal negligence occurs when a person "fails to be aware of a substantial risk that a wrongful act may occur," and that failure "constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

C.      Lawful Parental Discipline Under RCW 9A.16.100

Under RCW 9A.16.100, "physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child." RCW 9A.16.100 includes a nonexhaustive list of actions that are presumed unreasonable, including any "act that is likely to cause and which does cause bodily harm greater than transient pain or minor temporary marks." Additionally, "[t]he age, size, and condition of the child and the location of the injury shall be considered when determining whether the bodily harm is reasonable or moderate." RCW 9A.16.100.

RCW 9A.16.100 focuses on the reasonableness of the parent's discipline given the totality of the circumstances. *In re Dependency of H.S.*, 188 Wn. App. 654, 664, 356 P.3d 202 (2015). At least one Washington court has held that striking a child with a belt hard enough to cause bruises was unreasonable and not within a parent's right to inflict lawful physical discipline under RCW 9A.16.100. *See, e.g.*, *State v. Schlichtmann*, 114 Wn. App. 162, 169, 58 P.3d 901 (2002).

D.      Accomplice Liability

An accomplice is a person who "[s]olicits, commands, encourages, or requests [another] person to commit [the crime]" or who "[a]ids or agrees to aid [another] person in planning or committing" the crime, while knowing "that [their conduct] will promote or facilitate the commission of the crime." RCW 9A.08.020(3)(a). Washington law provides that, "regardless of whether the State relies on the word 'encourage' or the words 'solicit' or 'command' within RCW 9A.08.020(3)(a)(i), an accomplice must associate himself with the principal's criminal undertaking, participate in it as something he desires to bring about, and seek by his action to make it succeed." *State v. Jameison*, 4 Wn. App. 2d 184, 204-05, 421 P.3d 463 (2018). Mere presence and knowledge of the commission of a crime are ordinarily not enough for accomplice liability, unless there is "evidence from which a readiness to assist or an intent to encourage could be inferred." *Id.* at 205.

Accomplice liability does not require the State to prove "'that the principal and accomplice share the same mental state.'" *State v. Dreewes*, 192 Wn.2d 812, 824-25, 432 P.3d 795 (2019) (internal quotation marks omitted) (quoting *State v. Guloy*, 104 Wn.2d 412, 431, 705 P.2d 1182 (1985)). Rather, "the defendant must have knowledge that his actions will 'promote or facilitate' the commission of '*the*' particular crime at issue." *State v. Bauer*, 180 Wn.2d 929, 943, 329 P.3d 67 (2014) (internal quotation marks omitted) (quoting *State v. Stein*, 144 Wn.2d 236, 245, 27 P.3d 184 (2001)).

If "'criminal liability is predicated on the accomplice liability statute, the State is required to prove only the accomplice's general knowledge of his coparticipant's substantive crime. Specific knowledge of the elements of the coparticipant's crime need not be proved.'" *Dreewes*, 192 Wn.2d at 823 (emphasis omitted) (quoting *State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d 199 (1984)). Under Washington law, "'a person has actual knowledge when he or she has information

which would lead a reasonable person in the same situation to believe that he was promoting or facilitating the crime eventually charged.'" *Id.* at 825 (internal quotation marks omitted) (quoting *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015)).

To validly dismiss, the trial court here would have had to find that no material disputed facts existed and, viewing the evidence and reasonable inferences in the light most favorable to the State, the State failed to establish a prima facie case of guilt for third degree assault by complicity. Here, the elements of the crime would be met if (1) RC caused KJC bodily harm with criminal negligence by means of an instrument likely to produce bodily harm when she struck him with a belt at least 20 times and left bruises, (2) RC's actions were not excused by RCW 9A.16.100, (3) Birge and Jahner solicited or encouraged RC's striking of KJC with a belt, and (4) Birge and Jahner knew that encouraging and aiding RC to strike KJC with a belt would promote or facilitate the crime of third degree assault of a child.

E.      Prima Facie Case of Third Degree Assault of a Child by Complicity

We conclude the State's evidence, if true, was sufficient to establish a prima facie case of third degree assault of a child as accomplices and, therefore, these charges should not have been dismissed under CrR 8.3(c).

1.      Criminal act requirements

The State raised a material issue of fact as to whether RC's striking of KJC with the belt met the criminal act requirements for third degree assault of a child under RCW 9A.36.140(1). The State provided evidence showing that RC struck KJC at least 20 times with the strap of a leather belt and that the striking left marks on KJC's back, arms, and sides that were visible the next day. In *Schlichtmann*, "punishment was inflicted with a belt with force great enough to cause bruising," and the punishment constituted third degree assault of a child. 114 Wn. App. at 169.

As in *Schlichtmann,* RC's striking of KJC was sufficient to satisfy the "bodily harm" requirement of RCW 9A.36.031(1)(d). Considering the facts in the light most favorable to the State, a trier of fact could reasonably find that a leather belt is an "instrument . . . likely to produce bodily harm," thereby creating a disputed issue of fact as to whether the weapon or instrument requirement of RCW 9A.36.031(1)(d) was satisfied. Finally, a trier of fact could reasonably find from the evidence that RC acted with criminal negligence by failing to recognize a "substantial risk" that hitting KJC 20 to 25 times with a belt "constitute[d] a gross deviation from the standard of care that a reasonable person would exercise in the same situation," also creating an issue of fact. RCW 9A.08.010(1)(d).

There was a material issue of fact in dispute as to whether RC's striking of KJC was reasonable or moderate given the circumstances. *See* RCW 9A.16.100. Reasonableness of physical discipline involves a factual determination that had to be resolved by a jury. Viewing the discipline in light of the circumstances, a trier of fact could rationally conclude that it was not reasonable to hit a nine-year-old child with a belt more than 20 times hard enough to leave bruises when he had cognitive disabilities, developmental delays, oppositional defiance disorder, posttraumatic stress disorder, fetal alcohol spectrum disorder, attention deficit hyperactivity disorder, and psychosis.

Again viewing the evidence in the light most favorable to the State, there was a material issue of fact in dispute as to whether Birge and Jahner solicited, commanded, encouraged, requested, or aided RC's commission of third degree assault of KJC. *See* RCW 9A.08.020(3)(a). Viewing Straling's, Ncube's, and RC's statements in the light most favorable to the State, they support a reasonable inference that RC would not have hit KJC at all if not for Birge and Jahner instructing her to get a belt and strike KJC with it. These witnesses said that Birge and Jahner refused to call an ambulance to transport KJC, which RC felt was necessary for her own safety, unless she struck KJC with the belt. Birge and Jahner also said they would not respond to future

calls at her house unless she struck KJC with the belt. Jahner reportedly told RC that "'we ask people to do things once, and then we make them do it.'" SCP at 303.

According to the witnesses, both Birge and Jahner encouraged the assault by telling RC to beat KJC for every window he broke and failing to instruct RC, who had never hit a child before, on how much force to use. Viewing the evidence in the light most favorable to the State, Birge encouraged RC to inflict bodily harm on KJC and exceed reasonable and moderate discipline under the circumstances by telling RC to "'beat the demons out of [KJC].'" SCP at 306. And a rational trier of fact could find that Jahner aided the assault by holding KJC down and exposing his buttocks for the duration of the beating.

### 2. Mental state requirements

When viewed in the light most favorable to the State, the witnesses' statements would also support a rational jury finding that Birge and Jahner generally knew that encouraging and aiding RC to strike KJC at least 20 times with a belt promoted or facilitated an assault of a child. *See Dreewes*, 192 Wn.2d at 823-25. The trial court reasoned that, as a matter of law, Birge and Jahner could not have intended RC to assault KJC because they informed her about her rights to use *lawful* physical discipline on KJC under RCW 9A.16.100. But the witness statements showed that Birge and Jahner told RC to use a belt and showed her how to use it without cautioning her how hard to strike KJC. Birge told RC to "'beat the demons out of [KJC]'" and suggested that RC resort to hitting him in his sleep because he was squirming. SCP at 306. They showed RC how to hit KJC by striking the belt on a table. Jahner reportedly held RC down throughout the episode, making it possible for RC to strike KJC at least 20 times.

This evidence created an issue of fact as to whether the officers knew that encouraging and aiding RC in this way promoted physical discipline of a kind serious enough to cause bodily harm and leave marks on KJC's body. There was also a question of fact as to whether Birge and Jahner

14

knew at some point, given the context, that hitting a mentally ill nine year old with a belt hard enough to leave bruises was not reasonable or moderate and thus not lawful parental discipline. Because there existed a question of fact, the motion to dismiss should have been denied.

Birge and Jahner analogize to *Bauer*, 180 Wn.2d at 943-45, but *Bauer* is distinguishable. *Bauer* involved an incident where a child took one of Bauer's loaded guns, which was not safeguarded from children in the household, brought it to school and accidentally shot another child. 180 Wn.2d at 932-33. Birge and Jahner cite *Bauer* for the proposition that a defendant cannot be liable as an accomplice unless they act with "'the same mens rea as that required for the crime.'" Br. of Resp'ts at 15 (boldface omitted) (internal quotation marks omitted) (quoting *Bauer*, 180 Wn.2d at 944). However, this quoted portion of *Bauer* addressed a different form of complicity liability under RCW 9A.08.020(2)(a).[2] 180 Wn.2d at 943. By contrast, the accomplice liability provision applicable here, RCW 9A.08.020(2)(c)-(3)(a) does not require the defendant to act with the kind of culpability required for the crime. *See also id.* at 944-45.

In sum, the trial court erred when it dismissed the third degree child assault charges against Birge and Jahner. The State raised disputed material issues of fact and viewing the evidence and all reasonable inferences in the light most favorable to the State, it established a prima facie case of guilt against Birge and Jahner for third degree assault of a child as accomplices.

---

[2] The State relies on this prong of RCW 9A.08.020(2)(a), to argue that Birge and Jahner could also be guilty as principals because they arguably caused RC, an otherwise innocent person, to commit third degree assault of a child with at least the criminal negligence necessary to commit the underlying crime. But the State fails to show how RC meets the "innocent or irresponsible" requirement. RCW 9A.08.020(2)(a). Even though RC reported that she felt forced to beat KJC with the belt, the cases applying this prong applied it when children were forced to engage in illegal conduct. *See, e.g.*, *State v. Bobenhouse*, 166 Wn.2d 881, 889, 214 P.3d 907 (2009). The State does not point to a case where an adult subjected to threats like the ones alleged here was deemed innocent or irresponsible.

15

## II. OFFICIAL MISCONDUCT CHARGES

A.      Official Misconduct

The State argues that the trial court erred by granting the defendants' motion to dismiss the official misconduct charges because the State's evidence, if true, was sufficient for a reasonable trier of fact to convict Birge and Jahner of these charges. We hold that the trial court erred by dismissing the official misconduct charges.

Under RCW 9A.80.010(1), a police officer may be convicted of official misconduct if the State proves that "with intent to obtain a benefit or to deprive another person of a lawful right or privilege: (a) [the officer] intentionally commits an unauthorized act under color of law; or (b) . . . intentionally refrains from performing a duty imposed upon [them] by law."

Viewing the evidence in the light most favorable to the State without weighing conflicting statements or making credibility determinations, the State's evidence, if true, was sufficient to establish a prima facie case of official misconduct against Birge and Jahner. Viewing the evidence in the light most favorable to the State, a rational fact finder could conclude they intended to deprive KJC of his right to be free from an assault. Birge and Jahner informed RC about the parental discipline statute which, they argue, establishes that they intended only to facilitate lawful physical discipline. However, Birge and Jahner's intent was a question of fact, and because that fact is in dispute, the trial court erred by granting the motion to dismiss.

Specifically, Birge and Jahner instigated the belt striking by presenting RC with ultimatums, including the threat of withholding their assistance in the future, unless she agreed to hit KJC with the belt. According to witnesses, Birge instructed RC to "'beat the demons out of [KJC].'" SCP at 306. Jahner held KJC down on the couch throughout the belt striking, which directly facilitated KJC being struck at least 20 times. And a rational fact finder could infer that

the officers acted with the intent to deprive KJC of his right to be free from assault at some point during the incident, in light of the lengthy beating.

Under CrR 8.3(c)(3), the trial court was not entitled to "weigh conflicting statements and base its decision on the statement it finds the most credible." Given the competing evidence about the facts that give rise to inferences of the officers' intent, the question of whether Birge and Jahner actually intended to deprive KJC of his civil rights is a factual question that should have been reserved for the jury.

Drawing all reasonable inferences in favor of the State, and assuming the truth of these witness reports, a jury could also infer that Birge and Jahner intentionally interfered with RC's right to parent. Witnesses reported that RC resisted for five minutes and only gave in because the officers told her they would not transport KJC to the hospital unless she hit KJC with a belt. And they threatened not to respond to her house in the future unless she hit KJC with a belt.[3]

Viewing the evidence in the light most favorable to the State, we conclude that material facts are in dispute and the trial court erred by dismissing the charges of official misconduct against Birge and Jahner under 9A.80.010(1)(a).

B.      Constitutional Vagueness and Overbreadth

        1.      Vagueness

Here, Birge and Jahner assert that RCW 9A.80.010(1)(a) is unconstitutionally vague because the term "unauthorized act" is not defined and "[t]here is no possible way [to] ascertain the meaning of the term 'unauthorized.'" Br. of Resp'ts at 26. They contend that RCW

---

[3] To the extent Birge and Jahner argue that there was no evidence they "intended to gain a benefit from their actions," Br. of Resp'ts at 20-21, such evidence was not required to avoid dismissal because a public servant may commit official misconduct *either* by acting "with intent to obtain a benefit" *or* by acting to "deprive another person of a lawful right or privilege." *See* RCW 9A.80.010(1).

9A.80.010(1)(a) is unconstitutionally vague both on its face and as applied to their case. We disagree.

"Statutes are presumed to be constitutional, and the party asserting that a statute is unconstitutionally vague must prove its vagueness beyond a reasonable doubt." *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 796, 432 P.3d 805, *cert. denied*, ___ U.S. ___, 139 S. Ct. 2647, 204 L. Ed. 2d 284 (2019). "A facial challenge asserts that the statute cannot be properly applied in any context," while an as applied challenge requires analyzing the statute "in light of the facts of the specific case before the court." *Id.*

"'A statute is vague if either it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it, or if it does not provide standards sufficiently specific to prevent arbitrary enforcement.'" *State v. Yishmael*, 195 Wn.2d 155, 176, 456 P.3d 1172 (2020) (quoting *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004)). Vagueness must be considered in light of the entire statutory context, "afford[ing] a sensible, meaningful, and practical interpretation." *Evergreen Freedom Found.*, 192 Wn.2d at 797. A statute should not be deemed unconstitutionally vague merely because there is uncertainty as to its meaning or because "'a person cannot predict with complete certainty the exact point at which [that person's] actions would be classified as prohibited conduct.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *In re Contested Election of Schoessler*, 140 Wn.2d 368, 389, 998 P.2d 818 (2000)).

Birge and Jahner identify state and federal cases in which statutes were struck down as unconstitutionally vague because they used undefined terms that did not afford a reasonable person a chance to know what conduct was prohibited. These cases are distinguishable. The term "unauthorized act" is not defined in the statute, but that is not sufficient to render the statute unconstitutionally vague. *See id.* Further, RCW 9A.80.010(1)(a) affords a reasonable opportunity

18

to know what is prohibited. A person of reasonable intelligence could understand, applying a sensible and practical interpretation of the statute, that RCW 9A.80.010(1)(a)'s prohibition against "intentionally commit[ting] an unauthorized act under color of law" prohibits an officer from breaking a law while acting in their official capacity. *See id.*

Although the phrase "unauthorized act" may involve questions of fact for a jury to decide, the statute does not invite arbitrary enforcement because the statute does not leave a judge or jury with no limits on their discretion to define the proscribed criminal conduct. Although the question of what specifically constitutes an "unauthorized act," may require a subjective or fact specific inquiry, that does not render the statute unconstitutionally vague. Birge and Jahner point out that an "unauthorized act" may be defined by police department manuals, administrative regulations, state statutes or local ordinances, or other statewide policing standards.

Contrary to Birge and Jahner's argument, the fact that the term "unauthorized act" could be defined by reference to more than one source does not make the statute unconstitutionally vague. "'[D]ue process . . . forbids criminal statutes that contain *no* standards and allow police officers, judge, and the jury to subjectively decide what conduct the statute proscribes or what conduct will comply with a statute in any given case.'" *State v. Elkins*, 188 Wn. App. 386, 410-11, 353 P.3d 648 (2015) (emphasis added) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 181, 795 P.2d 693 (1990)). Here, criminal laws and administrative regulations, as well as employment standards, inform the subjective question of what constitutes an "unauthorized act" and do not leave the judge or jury with unconstrained discretion to define a crime. *See State v. Florea,* 296 Or. 500, 504, 677 P.2d 698 (1984) (holding that the term "unauthorized act" in Oregon's comparable, but not identical, misconduct statute was not unconstitutionally vague).

Birge and Jahner fail to show that there is no context in which this statute could be constitutionally applied. RCW 9A.80.010(1)(a) is not unconstitutionally vague on its face.

19

The term "unauthorized act" is also not vague in the context of this case. A person of common intelligence could understand that it is an unauthorized act to encourage and aid an adult to assault a disabled child. *See Yishmael*, 195 Wn.2d 176. Nor would Birge and Jahner be subjected to arbitrary enforcement because the alleged unauthorized act was a violation of a criminal statute. *Id.*

Additionally, Birge and Jahner argue that the phrase "to deprive another of a lawful right or privilege" is unconstitutionally vague because it is not clear what a "right" or a "privilege" means. RCW 9A.80.010(1); Br. of Resp'ts at 29. We reject this argument because a person of ordinary intelligence could view this phrase to mean that police officers cannot unlawfully deprive a child of the right to be free from bodily harm as a principal or accomplice or violate the fundamental liberty interest in parenting KJC. *See Evergreen Freedom Found.*, 192 Wn.2d at 797; *see also In re Welfare of D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020). Nor does this phrase give a judge or jury unconstrained discretion to invent crimes because rights and privileges are inherently defined by law.

We hold that Birge and Jahner have failed to show that RCW 9A.80.010(1)(a) is unconstitutionally vague facially or as applied.

2.      Overbreadth

Birge and Jahner argue that RCW 9A.80.010 is unconstitutionally overbroad because it implicates constitutionally protected speech and prohibits a substantial amount of protected speech. They allege that their advice to RC about her right to physically discipline KJC under the parental discipline statute was protected speech. We disagree.

"A law is overbroad if it 'sweeps within its prohibitions' a substantial amount of constitutionally protected conduct." *State v. Immelt*, 173 Wn.2d 1, 6, 267 P.3d 305 (2011) (quoting *City of Tacoma v. Luvene*, 118 Wn.2d 826, 839, 827 P.2d 1374 (1992)). The question of whether

the statute "'reaches constitutionally protected speech'" is a threshold matter in an overbreadth challenge. *Id.* at 7 (quoting *State v. Halstien*, 122 Wn.2d 109, 122, 857 P.2d 270 (1995)). A statute that can be construed to regulate only unprotected speech does not implicate the First Amendment to the United States Constitution and will not be overturned for overbreadth. *Id.* We review unconstitutional overbreadth de novo. *Id.* at 6.

The United States Supreme Court has held that one form of unprotected speech occurs "when public employees make statements pursuant to their official duties" because "the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). In *Garcetti,* the speech at issue was a memo written by a prosecutor as part of his official duties. *Id.* at 421-22. The prosecutor's speech could be legitimately restricted because he "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee." *Id.* at 422.

To the extent RCW 9A.80.010 prohibits speech and not exclusively conduct, it can be read as prohibiting only the *unprotected* speech of a public employee speaking pursuant to their official responsibilities. *Id.* at 421. RCW 9A.80.010(1)(a) specifically prohibits certain conduct by "[a] public servant" acting "under color of law." Because this statute can be construed to only prohibit speech not insulated by the First Amendment, and Birge and Jahner fail to show that the statute reaches a substantial amount of protected speech, we hold that Birge and Jahner's facial overbreadth challenge to RCW 9A.80.010 fails. *See Immelt*, 173 Wn.2d at 6-7.

We also reject Birge and Jahner's contention that they were ever exercising their free speech rights during the encounter at RC's house. As in *Garcetti*, when Birge and Jahner responded to a 911 call, they performed the tasks they were paid to perform. 547 U.S. at 422. Thus, even if Birge and Jahner did nothing more than tell RC that she had a lawful right to physically discipline

her child, they would have spoken as public employees pursuant to their official responsibilities and the First Amendment would provide no protection.[4] *Id.* at 421.

We hold that RCW 9A.80.010(1)(a) did not violate Birge and Jahner's free speech rights, and their overbreadth challenge fails.

CONCLUSION

We reverse the trial court's CrR 8.3(c) dismissal of the third degree child assault and official misconduct charges against Birge and Jahner and remand for proceedings consistent with this opinion.

Glasgow, J.

We concur:

Worswick, P.J.

Melnick, J.P.T.

---

[4] Moreover, some of Birge and Jahner's alleged comments, such as the instruction that RC "'beat the demons out of [KJC],'" SCP at 306, beat him for every window he broke, or hit him in his sleep, were likely also unprotected speech because they were "true threats." "'A "true threat" is a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon'" a person. *State v. Dawley*, 11 Wn. App. 2d 527, 535, 455 P.3d 205 (2019) (alteration in original) (internal quotation marks omitted) (quoting *State v. Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797 (1998)).