# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59161-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JESSE COSTILLO FRANKS, | |
| Appellant. | |

PRICE, J. — On the morning of November 27, 2020, Felicia Adams brought her fifteen-year-old son, K.R., to the emergency room.  Doctors determined that K.R. had suffered from cardiac arrest and made multiple, but unsuccessful, attempts to resuscitate him.  At his time of death, K.R. weighed about 61 pounds and had visible abrasions on his body.  He was later declared to have died from starvation and neglect.

Due to the suspicious circumstances of K.R.'s death, hospital staff made a report to child protective services, which resulted in an investigation into Adams and her husband, Jesse C. Franks.  Following the investigation, the two remaining children in the home, K.R.'s younger brothers, K.A. (age 13) and K.C. (age 14), were removed and placed in foster care.

Franks and Adams were charged with the death of K.R. and for the abuse of K.A. and K.C. After trial, Franks was convicted of one count of homicide by abuse for the death of K.R. and two counts of second degree criminal mistreatment, one count each for K.A. and K.C.  All of the crimes were charged as crimes of domestic violence.

Franks appeals, arguing that (1) there was insufficient evidence for his convictions, (2) the trial court erred by admitting evidence of his gambling at a local casino, including evidence that Franks and Adams went to a casino twice on the day of K.R.'s death, (3) the State committed prosecutorial misconduct during closing argument, (4) the trial court erred during sentencing by ordering a mental health evaluation without reasonable grounds, and (5) the trial court erred by imposing a lifetime no-contact order for K.A. and K.C. without considering less restrictive alternatives.

We affirm Franks' convictions and the lifetime no-contact order. But we remand to the trial court for further proceedings regarding the order for a mental health evaluation.

FACTS

I. BACKGROUND

Franks and Adams are a married couple who resided in Vancouver, Washington, with three children, K.R., K.A., and K.C., from about 2012 to 2020. Adams had legally adopted the three boys, but Franks had not. Still, the boys called Franks "dad."

The oldest child, K.R., was diagnosed with developmental delays, autism, and an eye condition that qualified him as legally blind. K.R.'s disabilities meant that he had limited speech and was mostly nonverbal. He had difficulty with tasks such as washing himself, tying his shoes, and using the toilet. When K.R. ate, he frequently chewed his food, swallowed it, then regurgitated it back up into his mouth before swallowing it again.

Franks and Adams required the boys to abide by specific "house rules." 6 Verbatim Rep. of Proc. (VRP) at 849. For example, breakfast ended at 9:00 a.m., and the boys had to ask permission if they wanted snacks or food between mealtimes. Punishment for breaking one of the

2

rules was generally either "getting a spanking" or being denied meals. 6 VRP at 850. K.R. would also be punished for regurgitating his food. Adams and Franks would yell at him, and if he continued, Adams would "pop" him with the back of her hand or hit him with a cane. 6 VRP at 851, 885.

In the years prior to K.R.'s death, the boys would often be in trouble for "stealing food," or eating food between meals. 6 VRP at 857. Even if only one of the boys took food, Franks and Adams would punish all of them if no one confessed.

Notwithstanding this restriction of meals as a form of discipline, the boys appeared to be in good health generally for a period of time. According to the boys' pediatrician and teachers, from around 2013 through 2018, the boys all appeared to be within the normal ranges for height, weight, and physical development. People described K.R. specifically as being "active," "strong," and "full of energy." 8 VRP at 1202-03, 1272. He enjoyed activities such as riding a tricycle, running around, and playing basketball.

But as time went on, the punishments for the boys got worse and more frequent. Instead of just hitting K.A. and K.C. with a paddle when they broke a rule, Adams started hitting them with an extension cord because "[the paddle] didn't really work that much." 9 VRP at 1600. And instead of just being denied regular meals, a lock was installed on the outside of the boys' bedroom door, and they would be locked inside, unable to leave without food and without access to a toilet. The boys would have to ask permission to be let out to use the restroom.

Things started to change even more drastically after the start of the COVID-19 pandemic in March 2020. Because of the pandemic, the boys' school became remote, and they no longer had access to school breakfasts and lunches. Dependent on Franks and Adams for all their meals,

3

the boys appeared to be stuck in an ongoing cycle of being hungry, getting caught taking food, and then being punished with food deprivation.

Due to these punishments, the boys would sometimes go "days" locked in their bedroom without food. 9 VRP at 1593, 1638. And when the boys did get meals, they often received half portions as punishment while Franks and Adams received full portions. They would be so hungry that they would feel weak, dizzy, or lightheaded during the day. K.R. would become so hungry that his brothers would hear him cry in his sleep. Cousins who were staying with the family in July 2020 described K.R. as "not in good shape" and "not looking healthy." 6 VRP at 865, 871.

During this period when K.R.'s school was remote, K.R.'s attendance went from nearly perfect to attending online only minimally. In fall 2020, the school offered to allow K.R. and other students in his special education class to receive some services in-person; however, Adams had concerns about K.R. attending classes in person. One teacher recalled that Adams was hesitant because of K.R.'s inability to keep a mask on consistently and because of the reluctance of the family to leave the home during the pandemic due to Adams' health issues.

As a result, K.R. remained at home and continued to struggle to attend classes online. The school met with both Franks and Adams to discuss K.R.'s individualized education plan (IEP) and to strategize how to keep him engaged during online classes; however, K.R.'s attendance did not improve. Another teacher recalled that she saw K.R. only five times between September and November 2020 and only through a computer screen. Although she thought K.R. looked thinner, she did not make a report to child protective services because her only view of him was through video.

Eventually K.R. became so weak that he had difficulty walking around or climbing up the stairs. He would often fall down and need to stay seated. By early November 2020, K.R. would not even get up to eat when food was prepared for him. According to K.C., if K.R. could not get up to eat, Franks and Adams would simply say that K.R. would not eat.

On the morning of November 27, 2020, the day of K.R.'s death, K.A. and K.C. noticed that K.R. had soiled himself in the middle of the night. While K.A., K.C., and Adams were giving K.R. a bath, K.R. became unresponsive. K.A. could not feel K.R.'s heartbeat. Adams took K.R. to the emergency room while Franks, K.A., and K.C. remained at home

At the hospital, doctors tried to revive K.R.; however, after they saw "absolutely no cardiac or heart activity," they declared K.R. deceased at 9:50 a.m. 6 VRP at 823. The doctors noted that K.R. appeared to be severely underweight and had abrasions on his body. Because of K.R.'s appearance and the circumstances of his death, one of the doctors reported K.R.'s death to child protective services (CPS).

Less than three hours after K.R.'s death, and before telling K.A. and K.C. that their brother had died, Franks and Adams were seen on video surveillance cameras gambling at a casino. They later returned to gamble at the casino a second time that day at 7:22 p.m. In the three months before K.R.'s death, Franks and Adams had visited this same casino 44 times.

As a result of the CPS report from the emergency room doctor, K.A. and K.C. were immediately removed from the home. Following an investigation, the State brought charges against both Franks and Adams as codefendants. Franks was charged initially with one count of homicide by abuse (domestic violence) and one count of second degree murder (domestic violence) for causing the death of K.R. The information was later amended to add two additional

counts of second degree criminal mistreatment (domestic violence) for starving and abusing K.C. and K.A.

The cases against Franks and Adams were joined for trial.

## II.  ADMISSION OF EVIDENCE OF GAMBLING

Prior to the start of trial, Franks moved in limine for the exclusion of "any evidence of gambling as improper character evidence under ER 404, irrelevant under 402, and substantially more prejudicial than probative under ER 403."  Clerk's Papers (CP) at 479.

At the hearing, the State spoke first and argued that the gambling evidence it wanted to offer was relevant to proving the homicide by abuse charges.  The State explained that it specifically wanted to offer video of Franks and Adams gambling at a casino "within hours" of K.R.'s death because it would show that they possessed the requisite mental state for homicide by abuse by exhibiting "extreme indifference" to K.R.'s life.  4 VRP at 330, 333.  The State went on to say:

> Here, . . . the child dies in the hospital and then within hours the Defendants are at the . . . [c]asino gambling.  I understand that Defense is saying that they have a gambling addiction.  You know, if we say that's true, which it may well be true, I think that goes to the weight of the evidence, not the admissibility of it.  And then I think most importantly here is, you know, they're at the casino, and it's not just that, but they do appear to be happy.

4 VRP at 331-32.

The State played the video of Franks and Adams at the casino for the trial court and highlighted parts of the video where the State contended that "they appear[ed] to be celebrating . . . about their winnings," which was "not consistent with what you might expect to see a parent do after the loss of a child."  4 VRP at 333.  The State also mentioned that K.R.'s

brothers "were, obviously, grieving" after K.R.'s death, but they were left at home while Franks and Adams were at the casino. 4 VRP at 336. While again acknowledging the possibility that Franks and Adams were at the casino "post a traumatic event because of their addiction to gambling," the State argued that even assuming this was true, the gambling evidence from the day of K.R.'s death still went "directly" to the issue of extreme indifference. 4 VRP at 333.

Franks' counsel responded that the gambling evidence was irrelevant to the issue of extreme indifference and unduly prejudicial. They argued that the State's portrayal of the gambling footage "cherry-picked moments" and that when viewed in context, the footage was irrelevant. 4 VRP at 335. Franks' counsel went on to provide a different interpretation of what the video footage depicted:

> [W]hen we see the initial smile, what I saw was two people walking into the casino during COVID where they have to be masked up, but where they're also having facial recognition going through the doors. And so they pull down their masks and smile for the camera, essentially.
>
> I don't think that . . . it's relevant because in that it doesn't show an extreme indifference to human life. It shows two people going in somewhere and removing their masks and making sure that the facial recognition software that the casino uses is picking them up and so that they can enter, that they're not people that have been previously excluded by security, something like that.

4 VRP at 334. Franks' counsel also contended that the footage of Franks and Adams celebrating their winnings was more of an automatic reaction to winning money rather than going to extreme indifference to human life.

Franks' counsel further argued that the evidence was overly prejudicial because it was "speculating as to someone's state of mind and emotions over the loss of someone" and because of the general "morality issue" surrounding gambling. 4 VRP at 334.

The trial court denied the motion to exclude the evidence. While the trial court acknowledged the issue was "close," the immediacy of Franks and Adams going to the casino so soon after K.R.'s death made the relevance outweigh its prejudice.

III. JURY TRIAL

A.  K.A.'S AND K.C.'S TESTIMONY

K.A. and K.C. gave similar testimony, consistent with the above facts, about their experiences growing up with Franks and Adams and about the circumstances leading up to K.R.'s death. Throughout their testimony about the discipline and conditions in the household, they generally referred equally to both Franks and Adams.

They both described Franks and Adams' form of corporal punishment for discipline. They explained that they would be "spank[ed]" around 20 times in a row, each time they broke one of the house's rules. 9 VRP at 1499, 1595. Franks spanked them with a paddle or a belt. Adams would also hit K.R. in the head with her hand or a cane if he regurgitated his food.

K.A. and K.C. would often get punished for taking or "stealing" food without permission. K.A. explained that Adams would search their room for crumbs, wrappers, or other evidence that they had eaten food, and then either she or Franks would punish them.

> [K.A.:] . . . [Adams] was the one who usually, like, went and searched our room.
> [State:] Oh, okay. And what would [Adams] do?
> [K.A.:] When she found them?
> [State:] Yeah.
> [K.A.:] She would tell [Franks] and either she or [Franks] would spank us.

9 VRP at 1604-05.

8

They also explained how they would also be punished by having food withheld.  K.C. said,

If for [what]ever reason, like, I got in trouble or whatever, there . . . given like a time, like, I would have to go a week without food.  And then like after that week is over, I'll be able to get food again.

9 VRP at 1502.  K.A. similarly said that if food was missing and nobody admitted who took it, all three of the brothers would go "a couple of days" without eating.  9 VRP at 1593, 1626.

K.A. and K.C. remembered their punishments getting worse as they got older.  K.C. testified that Franks installed a lock on the outside of the boys' door to prevent them from stealing food or other items from the house (K.A. remembered it was Adams who installed the lock).  Franks and Adams would lock the boys in their room every night and let them out every morning.  But if the boys were being punished, they described how Franks and Adams would lock them in their room for days at a time with only a cup of water.

Eventually, K.A. and K.C. said that they figured out a way to get out of their locked room in the middle of the night to get food if they were hungry.  K.C. explained,

[M]e and my brother, being desperately hungry, we just—we found out a way just to, like, unlock it.  Like—like, from the lock, we just found a way to unlock it . . . . and just take stuff.

9 VRP at 1503.

K.A. and K.C. explained that the food restrictions got dramatically worse after the start of the COVID-19 pandemic.  They would often get punished by getting locked in their room without food, or "if [they] were lucky," they would receive half portions of food.  9 VRP at 1645.

The punishments became so frequent that K.C. remembered feeling hungry for "close to a month."  9 VRP at 1502.  He also began noticing changes in his body—he was skinny, he felt

9

weak, and he would wake up lightheaded. K.A. remembered that the three of them "barely had any energy." 9 VRP at 1617.

K.A. and K.C. noticed that K.R. was even more affected by the frequent food restrictions. K.C. recalled,

> He was getting skinnier than us. And, like, he was—he was starting to, like, not being able to, like, stand up.
>
> . . . .
>
> He was always getting hungry. Like—like late—late at night, he would, like, be crying because he couldn't get any food. We were locked in the room and like—he—he would just be crying sometimes.

9VRP at 1506, 1508. K.A. testified that he also observed that K.R.'s energy levels greatly diminished.

K.A. and K.C. remembered a couple of times when Franks would try to sneak them snacks while they were locked in their room and told them to ask him if they ever needed extra food. But, for the most part, Franks did not provide them any additional food.

> [State:] In those last few months, [K.A.], did you ask [Franks] for food?
>
> [K.A.:] I'm pretty sure one of us asked him a couple times, but he was pretty much like [Adams'] puppet. And so if she said no, then it was a no.

9 VRP at 1658.

Both K.A. and K.C. said that in the weeks leading up to K.R.'s death, K.R. "just wouldn't get up" even if food had been prepared for him. 9 VRP at 1509. Franks and Adams also apparently noticed K.R.'s inability to stand up, but the boys testified that Adams said that "if [K.R.] didn't get up, he wouldn't eat." 9 VRP at 1507.

When K.R. did eat, "they were giving him rice to, like, give him some meat on his bones." 9 VRP at 1612. However, in the month prior to K.R.'s death, all three of them were "barely eating." 9 VRP at 1612.

> [State:] How come you weren't eating in that last month?
>
> [K.A.:] Because we'd like—because we'd be hungry at night, so we'd [take] some food, and they noticed it was missing the next morning and we'd just be getting in more trouble.

9 VRP at 1612.

## B. FRANKS' TESTIMONY

Franks testified in his own defense and appeared to place responsibility for the household on Adams. Franks began by explaining that he had never legally adopted the boys, but they always called him "dad." Franks described himself as a "stay-at-home dad" for the entire time that the family lived in Washington. 12 VRP at 2162. For most of K.R.'s life, Franks acted as K.R.'s caregiver. He would help K.R. wash himself and brush his teeth.

However, apart from these "basics," Franks claimed that Adams controlled the household. 12 VRP at 2182.

> I didn't run anything. I just did the basics like teaching them how to clean their selves, brush their teeth, and stuff like that. But I had no per se leg to stand on as far as paying bills, groceries, or anything.
>
> So I kind of just stood back from trying to, you know, help around the way—like, you know, around the way. Like, when the boys would come to me, I would be like what? And they would ask me. And then I would say okay. Go see [if] your mom will. If she didn't do it, then I would do it . . .

12 VRP at 2182-83. Similarly, if Franks had any concerns about the boys' wellbeing or health, he "would throw little things out there about them going to the doctors," but he generally "stayed out

11

of [it]." 12 VRP at 2207. "[W]hatever she told [him], [he would] just like okay." 12 VRP at 2207.

Franks also explained his philosophy on disciplining the boys. He said that he tried to "keep them on the straightened path and narrow." 12 VRP at 2168. Sometimes this discipline involved spanking the boys with a belt and a paddle or making them do chores. However, Franks said that he later stopped spanking the boys.

> [T]he punishments could vary from getting scriptures out of the bible and coming and explaining them to us to cutting the backyard to cleaning up the driveway or helping me out in the garage, something, not just always spankings because I eventually stopped doing that . . . .

12 VRP at 2201-02. But Franks denied ever physically punishing K.R. He said that he did not believe that doing so was right given K.R.'s disabilities.

Franks admitted that he would sometimes lock the boys in their room as punishment. But he described it differently than K.A. and K.C. In response to a question about how long the boys would typically be locked in their room, Franks said,

> During the week they would come home from school if you're meaning about school time. And then they would do whatever they needed to do. Like, if it's lunch time, they'll eat. And then after they eat, they go to their room. And that's until their punishment was over.

12 VRP at 2170-71. Because the boys' punishment was occasionally so long that they would go periods of time without any food, Franks said he would sometimes sneak food to them without Adams knowing. Franks claimed that he would also give K.R. food "[a]ny chance [he] got"—even if Adams got mad at him or did not want him to. 12 VRP at 2172.

Franks conceded that the boys would sometimes miss meals while they were locked in their room, but he denied that withholding food itself was ever used as a way to punish the boys. He

also emphasized that the boys were not locked in their room "all the time." 12 VRP at 2187. He said that they would not lock the boys in their room if he and Adams left the house. And sometimes when the boys were being punished, the door wasn't locked and the boys just stayed in their room.

Franks claimed that the day before K.R. died, he was afraid something was wrong with K.R. Franks said he "begged" Adams, asking her if K.R. was alright. 12 VRP at 2174. He said Adams responded that K.R. was fine and that, in any event, he had a doctor's appointment coming up. Although Franks still did not believe K.R. was okay, he did not say anything more to Adams. He claimed that because he was not K.R.'s legal parent, he was not able to take him to the doctor himself.

C. DR. MATTHEW DAVEY'S TESTIMONY

Dr. Davey was the emergency room doctor who tried to save K.R. on the day of his death. He explained that K.R. arrived at the emergency room on November 27, 2020, at 9:34 a.m. As soon as K.R. arrived, Dr. Davey noted that K.R. appeared to have undergone cardiac arrest. Dr. Davey and multiple other emergency room staff immediately began CPR and other lifesaving measures.

Dr. Davey recalled that K.R. appeared "incredibly" underweight and had abrasions and scratches on his neck and chest. He said that K.R. showed such cachexia, or "loss of fat and muscle tissue," that he had to give K.R. medicine through a catheter directly into K.R.'s bone instead of the normal method of through a vein.

After multiple attempts of reviving K.R. and seeing "absolutely no cardiac or heart activity," K.R. was pronounced dead at 9:50 a.m. 6 VRP at 823.

Dr. Davey noted that when he told Adams about K.R.'s death that she appeared "appropriately distraught." 6 VRP at 828. Nevertheless, based on K.R.'s appearance and the circumstances of K.R.'s death, Dr. Davey told a nurse to make a report to CPS. Dr. Davey explained that he made the report because of K.R.'s physical condition and because of reports that Adams apparently had not rushed K.R. to the hospital and was playing loud music when she arrived:

> I think the appearance of severe cachexia, the—the abrasions that—that we had noted. And then other information that—that we had obtained from—I had written from the mother that—that told me that she had stopped along the way.
>
> . . . .
>
> And then our ER tech that obtained the patient from the car noted that the music was playing very loudly, is what I noted in the—in my note.

6 VRP at 829.

D. MAUREEN SHARBER'S TESTIMONY

Maureen Sharber testified that she became a foster parent to K.A. and K.C. in November 2020, after K.R.'s death. She said that when the boys first came to her home, they appeared "not healthy" and "very underweight." 8 VRP at 1312. She described K.C. as having "very dark circles under his eyes" and "just look[ing] kind of weak." 8 VRP at 1318. K.A. also appeared underweight but not "as bad" as K.C. 8 VRP at 1321.

Sharber said that when K.A. and K.C. first arrived at her home, they had limited strength and she would have to cut activities short because they tired quickly. She took them bike riding, but on their first ride, she realized that "they didn't have any strength or endurance to . . . go on a bike ride that a typical teenager would be able to go on." 8 VRP at 1315. Several weeks later, she tried to take them snowboarding, but they similarly "didn't have the strength." 8 VRP at 1316.

14

Sharber said that she also tried taking K.A. and K.C. to a water park but they got "very tired" from having to walk up the stairs to go on the rides. 8 VRP at 1318.

Sharber testified that the boys "acted like they were hungry all of the time" and exhibited unusual behaviors around food. 8 VRP at 1312. She explained,

> They—they were just—they were really, really, really hungry. They acted like they were hungry all of the time. And they had a lot of behaviors with hiding food and—and stashing food to make sure that they would have access to it even though they had, you know, full access to all the food that we had in the house. They—they just—they hoarded a lot. They hid food all over the house . . . .
>
> . . . .
>
> [T]hey had food available to them, but they always wanted to make sure that—that they—they would have some stashed if they needed it, I guess. But they were—like [K.C.] would take apart the drawers of his school desk where there was, like, an—there were two drawers in his desk, and then there was, like, a blank space behind each of the drawers. And he would take that apart and hide food in there. . . . [H]e would dismantle the desk to get the food into the space. You know, hid it in shoes, hid it in backpacks. Slit the mattress so that he could slide food into the—the mattress.

8 VRP at 1312-13.

Sharber also recalled that K.A. and K.C. "would urinate in containers like water bottles, baggies, . . . and also stash those around their room," even though their room was right next to the bathroom. 8 VRP at 1315. She said that they kept doing this the entire time that they stayed with her.

E. DR. KIMBERLY COPELAND'S TESTIMONY

Dr. Copeland testified about her review of K.R.'s medical records and her evaluations of K.A. and K.C. Dr. Copeland is the site medical director for the Child Abuse Assessment Team at Legacy Health Systems Salmon Creek clinic. The purpose of the team is to "provide medical evaluations for any child [about whom] there is . . . concerns of child maltreatment." 10 VRP at

15

1707.  The team conducts evaluations for children who suffer "any form" of child maltreatment, including physical abuse, sexual abuse, and neglect.  10 VRP at 1707.  Most of their patients come through referrals from CPS workers or law enforcement.

Dr. Copeland provided her review of K.R.'s medical history and information at his time of death.  Dr. Copeland said that between K.R.'s last medical visit in June 2019 and his death in November 2020, K.R. had lost 54 pounds, going from 115 pounds to 61 pounds.  Looking at K.R.'s growth over time, Dr. Copeland explained that K.R.'s weight at his time of death was "significantly off the chart" of what was projected based on K.R.'s expected growth rate.  10 VRP at 1781.

As for her medical evaluations of K.A. and K.C., Dr. Copeland said that in January 2021, she reviewed their medical histories and compared data from their childhood medical visits to data gathered in November 2020 after they had been removed from Franks' and Adams' home.  For K.A., Dr. Copeland noted that in the more than two years between his last doctor's visit in 2018 and November 2020, K.A. had gained only 5.5 pounds, and he was below his expected height.  Dr. Copeland explained that this change was "quite significant" because it showed that K.A. was no longer growing or gaining weight at the expected rate.  10 VRP at 1764.

> What you'll see with nutritional issues when people aren't getting enough calorie intake to meet their needs, you will see first the effects with weight loss.  It's not until the nutritional deprivation has gone on some time that you will see height impacted.
>
> So these data points are very important to me in assessing that this wasn't just a temporary situation.  It went on long enough and was severe enough that it affected not just weight but also height.

10 VRP at 1764-65.

Dr. Copeland collected similar data from K.C.  She said that in the years between K.C.'s last doctor's appointment when he was 11 years old and November 2020 when he was 14 years

old, K.C. gained only 13 pounds and his height was "well below" where it should have been. 10 VRP at 1776. Dr. Copeland also compared photos of K.C. taken in November 2020 and photos taken when she examined him in January 2021 (after two months in foster care). In November 2020, K.C.'s face appeared "more sunken in," "his back muscle trapezius and his collar bone [were] well outlined," and his spinal vertebrae and shoulder blades were "quite prominent[]." 10 VRP at 1734, 1740. But by January 2021, "his cheeks ha[d] filled in" and his collar bone was not as prominent as before. 10 VRP at 1734. In those two months, K.C. had gained 20 pounds, going from about 77 pounds to 97 pounds.

On the stand, Dr. Copeland also referenced more recent records of K.C.'s height and weight from June 2022. According to Dr. Copeland, although K.C. showed that he had "recovered" some of his lost height and weight over the two years since leaving Franks and Adams, there was "only so much height that he was going to be able to recover physiologically." 10 VRP at 1777. K.C.'s level of nutritional deprivation had been so significant that Dr. Copeland theorized that it "likely compromised his maximum adult height." 10 VRP at 1803.

Based on Dr. Copeland's review of all three of the boys' medical histories, she concluded that in November 2020, they presented symptoms of significant and ongoing malnutrition and nutritional deprivation. Dr. Copeland finished her testimony with a description of the symptoms of nutritional deprivation. She explained that at first it feels like the common feeling of hunger. "You're feeling hungry. You experience . . . hunger pains . . . . There's an increased craving for food." 10 VRP at 1794. Next, it progresses into lack of energy and decreased focus.

> You can't concentrate as well as you would if you were able to have the meal or snack that you're wanting. You also begin over time to lose interest in things. And then this can become a cycle because each thing is contributing to the other.

17

10 VRP at 1794. Eventually, a person loses weight and muscle tissue, "it becomes [a] vicious cycle, and there's increasing wasting, and there's increasing feeling worse." 10 VRP at 1795. Last,

> as it progresses to the more extreme levels is when you start to see the height impacted. Then you can also start to see the cognition piece of it impacted more when you have someone that's becoming more and more lethargic.

10 VRP at 1795.

IV. JURY INSTRUCTIONS

After the presentation of the evidence, the trial court instructed the jury on the necessary elements to prove the charges against Franks. The to-convict instruction for homicide by abuse provided, in relevant part,

> (1) That on or about or between March 1, 2020 and November 27, 2020, the defendant or an accomplice acted under circumstances manifesting an extreme indifference to human life;
>
> (2) That [K.R.] died as a result of defendant's or an accomplice's acts;
>
> . . . .
>
> (4) That the defendant or an accomplice previously engaged in a pattern or practice of assault or torture of [K.R.];
>
> . . . .

CP at 664.

The to-convict instructions for second degree criminal mistreatment of K.A. and K.C. required that Franks as a principle or an accomplice acted with criminal negligence and either,

> created an imminent and substantial risk of death or great bodily harm to [K.A./K.C.] by withholding any of the basic necessities of life; or
>
> . . . caused substantial bodily harm by withholding any of the basic necessities of life;
>
> . . . .

CP at 685-86. The to-convict instructions also required the State to prove that Franks had been entrusted with the physical custody of K.A. and K.C. or had assumed the responsibility to provide to them the basic necessities of life.

The instructions further defined "great bodily harm" as a "bodily injury that creates a high probability of death, or that causes serious permanent disfigurement, or that cause a permanent or protected loss or impairment of the function of any bodily part or organ." CP at 681. "Substantial bodily harm" was defined as "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." CP at 683.

V. CLOSING ARGUMENTS

A. STATE'S CLOSING

During closing arguments, the State acknowledged that Adams was the focus of a lot of the allegations of abuse against K.R., K.A., and K.C. But the State also argued that this "does not exonerate" Franks. 12 VRP at 2266. The State went on to emphasize the ways that Franks was more than a bystander and was an active participant in the boys' abuse:

> [Franks] is there at home every day. He sees what is going on. He knows the rules. He enforces those rules. Whether directed by [Adams] or on his own accord, he locks the boys in their bedroom. He hits them with a paddle or with a belt. He helps carry out these crimes.
>
> He cannot separate himself from this case by sneaking them a snack here and there. He cannot separate himself from this case by feigning ignorance as to what is going on. He's an accomplice. He's liable.

12 VRP at 2266.

The State also argued that Franks could not escape liability, specifically for charges of criminal mistreatment of K.A. and K.C., by claiming that he was not their legal parent and had not "assumed the responsibility" for providing for them. 12 VRP at 2267. It pointed out that not only did the boys call Franks "dad," but he also "assumed the role of dad in every single way." 12 VRP at 2267.

B. FRANKS' CLOSING

During his closing, Franks' counsel argued that Franks could not be found guilty as an accomplice because his "mere presence and knowledge of [Adams' abuse]" was not enough and that he in no way assisted or encouraged Adams to abuse any of the boys. 13 VRP at 2362.

Franks' counsel also reminded the jury of the State's burden and outlined the ways that they failed to prove certain elements of each charge. Specifically, Franks' counsel contended that there was insufficient evidence to prove that Franks exhibited extreme indifference for human life. Responding to the evidence of Franks and Adams at the casino after K.R.'s death, counsel argued,

> I submit to you that the State was showing that to show an extreme indifference. But my point is how are people supposed to be after a child dies? Would we judge a wealthy businessman for drinking a bottle of scotch afterwards?

13 VRP at 2351.

Franks' counsel also argued that the State could not prove all of the elements of criminal mistreatment of K.A. and K.C. because he was not a parent or otherwise responsible for providing for the boys.

> Now, one of the things in the instructions is that [sic] [Franks] has to assume the responsibility of providing all these things regarding criminal mistreatment and criminal—well, criminal mistreatment 1 and 2.

20

> We have the adoption records. And, you know, did he assume the responsibility of bringing pull-ups to the school when [Adams] asked? Yeah. Did he assume the responsibility of going to talk to [K.R.] when [his teacher] needed his help? Yeah.

> But there's no evidence, and that's what you have to base your decisions on, that he assumed the responsibility to do other things other than give them extra food.

13 VRP at 2359-60.

Later, at the end of their argument, Franks' counsel circled back to the State's failure to prove the extreme indifference element and accomplice liability:

> I submit to you that [Franks] cared about these kids, no extreme indifference to human life. I submit to you that [Franks] did not starve [K.R.]. I submit to you that [Franks] did not criminally mistreat [K.R.], [K.A.], or [K.C.]. And I submit to you [Franks] didn't help anyone do these things. [Franks] didn't aid or assist anyone doing these things. Mere presence and knowledge it takes more to find someone's an accomplice.

13 VRP at 2363.

C. STATE'S REBUTTAL

In rebuttal, the State challenged defense counsel's contention that there was insufficient evidence to prove that Adams and Franks had extreme indifference towards K.R. by explaining that even though Franks and Adams showed the boys some care, the evidence was still sufficient.

> Giving the boys some crackers while they're confined for a month is not enough to get you out of that extreme category. Attending mandatory [Individual Educational Program] meetings at the school, that's not the same as caring whether [K.R.] lives or dies. And again [Adams] holds herself out to the world as this involved mother, this involved parent because that is what she is supposed to be. She's not going to advertise this abusiveness on her sleeve, and neither is [Franks].

13 VRP at 2399; *see also* 8 VRP at 1209. The State then went on to explain how Franks' attempt to minimize his role in the boys' abuse also does not negate his liability.

> And [Franks] does have a duty here. He's dad. He tells you that in his own testimony. Actions speak louder than words. Crying on the stand, claiming that

21

you cared three years after the fact when you are on the hook for murder does not negate your actions.

The defendants were not crying when they were hitting these children with paddles, with belts, with extension cords. The defendants were not crying when they were confining these kids to their room at night, confining them to their room for days at a time.

13 VRP at 2499. The State also contended that even if Franks, personally, did not exhibit extreme indifference, he was still liable as an accomplice.

Let's pretend just for a minute—let's pretend for a minute that [Franks] did not have extreme indifference. It does not matter here, because [Adams] did. If he is an accomplice, then doing only part of the crime in furtherance of the crime is enough. He hit them. He locked their door. He followed [Adams'] directives or rules or whatever to prevent them from eating freely. That is all part of the crime.

13 VRP at 2400.

VI. VERDICT AND SENTENCING

After deliberating, the jury found Franks guilty as a principal or accomplice of one count of homicide by abuse, one count of second degree felony murder for the death of K.R., and two counts of second degree criminal mistreatment for K.A. and K.C. All of the crimes were designated as crimes of domestic violence.

At sentencing, the State acknowledged that factors such as Franks' lack of education, "potential generational trauma," and "the power dynamic" with Adams contributed to the commission of his crimes; however, because of Franks' active role in abusing all three boys, the State requested a high-end sentence of 374 months.

The State also asked the trial court to order mental health treatment through the "Thinking for Change Program" and to impose a lifetime no-contact order with K.A. and K.C.

The trial court first vacated the second degree felony murder count to avoid double jeopardy issues with the homicide by abuse count. The trial court then sentenced Franks to 360 months, with the judge calling the case "one of the worst cases" she had ever seen in her 37 years as a criminal attorney or as a judge. 12 VRP at 2441. The trial court also granted the State's requests for a mental health evaluation and imposed a lifetime no-contact order for K.A. or K.C.

Franks appeals.

ANALYSIS

Franks makes multiple assignments of error. He argues that (1) the trial court abused its discretion when it admitted evidence of gambling, (2) there is insufficient evidence to sustain his convictions for homicide by abuse and second degree criminal mistreatment, (3) the State committed prosecutorial misconduct by misstating the applicable law at closing argument, and (4) the trial court abused its discretion at sentencing when it ordered a mental health evaluation and imposed a lifetime no-contact order. We affirm Franks' convictions but remand for further proceedings regarding the order for a mental health evaluation.

I. ADMISSION OF EVIDENCE OF GAMBLING

Franks argues the trial court abused its discretion when it denied his motion in limine and admitted evidence that Franks went to a casino on the day of K.R.'s death. Relying on *State v. Madarash*,[1] he argues that because the evidence was about his behavior *after* K.R.'s death, not before, it was irrelevant to the issue of extreme indifference and was unfairly prejudicial. We disagree.

---

[1] 116 Wn. App. 500, 66 P.3d 682 (2003).

We review a trial court's decision to admit evidence for an abuse of discretion. *State v. Kelly*, 32 Wn. App. 2d 241, 264, 555 P.3d 918 (2024). Generally, under the rules of evidence, relevant evidence is admissible. ER 402. "Relevant evidence" is that which has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401 (emphasis added). But even relevant evidence can be excluded if its relevance is substantially outweighed by unfair prejudice. ER 403. Evidence is unfairly prejudicial when it is more likely to create an emotional response from a jury instead of a rational decision. *See State v. Scherf*, 192 Wn.2d 350, 388, 429 P.3d 776 (2018). Once evidence is deemed relevant and admissible, its weight, credibility, or persuasiveness are questions for the jury. *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012), *review denied*, 176 Wn.2d 1015 (2013).

*Madarash* was a horrific case of homicide by abuse, involving considerable evidence of the defendant's actions both before and after the death of the young four-year-old victim. 116 Wn. App. at 502, 512-13. There, the defendant, Madarash, among multiple disturbing and abusive acts, forced the victim to drink so much soda that the victim threw up on her. *Id.* at 512. Then, "[r]ather than helping [the victim], Madarash forced her into a cold bath, began throwing water on her face, and held her face under the water," causing the victim to sustain bruises. *Id.* The defendant also ignored the victim's pleas to stop and delayed in calling 9-1-1 when the victim was "wheezing, throwing up, and had diarrhea." *Id.* at 513. After the victim's death, the court specifically mentioned how "Madarash displayed no signs of emotion over [the victim's] death" and how she "chuckled" while recounting to a friend that the victim had vomited in her hair. *Id.*

Franks contends that *Madarash* stands for the idea that the issue of extreme indifference is determined by what the defendant did *before* the victim's death. Appellant's Opening Br. at 46 ("Whether the defendant[] exhibited extreme indifference to the victim's life depends on what defendant[] did before the victim's death."). He argues that being at the casino *after* K.R.'s death is irrelevant to this issue and should have been excluded.

The State responds that *Madarash* compels the opposite conclusion. The State characterizes *Madarash* as looking at both the abuse before the victim's death *and* Madarash's lack of emotion after the death in order to conclude that Madarash exhibited extreme indifference. Thus, *Madarash* supports finding that Franks' actions *after* K.R.'s death are still indicative of extreme indifference. According to the State, it follows that evidence of Franks' gambling at the casino within hours of K.R.'s death is relevant to show that Franks did not care whether K.R. lived or died.

We agree with the State that *Madarash*, with its broad description of evidence that supported extreme indifference in that case, does not support excluding evidence merely because it post-dates K.R.'s death by a few hours. And Franks cites no other authority supporting his contention that we must consider only "pre-death" conduct when determining the issue of extreme indifference. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

While post-death evidence may not be relevant in every case, it was relevant here because of its closeness in time to K.R.'s death. Beyond being present at the casino within hours of K.R.'s death at the hospital, the video footage also apparently shows Franks and Adams smiling and

celebrating over their winnings. Like the evidence of Madarash laughing about her victim's death, this type of evidence of Franks' behavior immediately after K.R.'s death is relevant to whether Franks was indifferent as to whether K.R. lived or died. Although alternative inferences are also possible as to why Franks was at the casino, such as a gambling addict's response to grief, those explanations would go to the weight of the evidence, not to admissibility. Thus, the trial court did not err by admitting evidence of Franks at the casino.[2]

## II. Sufficiency of the Evidence

Franks next argues that there is insufficient evidence to support his convictions for homicide by abuse and second degree criminal mistreatment. Franks largely contends that his role in K.R.'s death and in the abuse of K.A. and K.C. was "at most a passive role," and thus the evidence fell short of proving these crimes either as a principal or as an accomplice. Appellant's Opening Br. at 40. We disagree.

## A. Legal Principles

### 1. Standard of Review

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We view the evidence in the light most favorable to the State and determine whether any rational finder of fact could find that all the elements of the charged crime

---

[2] In a single paragraph, Franks appears to raise an additional argument that the evidence of his numerous visits to the casino in the months *before* K.R.'s death is inadmissible because it "was minimal and overly prejudicial" and "did nothing to enlighten the jury about . . . Franks' mindset prior to [K.R.'s] death." Appellant's Opening Br. at 47. But because Franks fails to adequately brief this argument, we decline to consider it. *See Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) ("We will not consider an inadequately briefed argument.").

were proven beyond a reasonable doubt. *Id.* A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Roberts*, 5 Wn.3d 222, 237, 572 P.3d 1191 (2025). All reasonable inferences are drawn in favor of the State and interpreted against the defendant. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014).

2. Accomplice Liability

Accomplice liability allows a defendant to become legally accountable for the conduct of another. RCW 9A.08.020. An accomplice shares equal responsibility for the commission of a criminal offense as the principal actor and is thus equally liable. *State v. McDonald*, 138 Wn.2d 680, 689, 981 P.2d 443 (1999) (" '[O]ne who participates in a crime is guilty as a principal, regardless of the degree of participation.' " (emphasis omitted) (quoting *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991))). Accordingly, if a trial court finds a defendant liable as an accomplice, it is unnecessary for the court to "engage in the empty exercise" of determining if the defendant is also liable as a principal. *Id.*

To find a defendant guilty via accomplice liability, the State must prove that the defendant knowingly either solicited, commanded, encouraged, or requested another person to commit the specific crime at issue or aided or agreed to aid that person in planning or committing it. RCW 9A.08.020(3); *State v. Birge*, 16 Wn. App. 2d 16, 31-32, 478 P.3d 1144 (2021). An accomplice need not have specific knowledge of the elements of the principal's crime; it is enough for them to " '[possess] information which would lead a reasonable person in the same situation to believe that [they were] promoting or facilitating the crime eventually charged.' " *Birge*, 16 Wn. App. 2d

at 32 (internal quotation marks omitted) (quoting *State v. Dreewes*, 192 Wn.2d 812, 825, 432 P.3d 795 (2019)).

"Knowingly aiding" can include promoting or facilitating a crime or "being present and ready to assist." *State v. Hanley*, 33 Wn. App. 2d 99, 111, 559 P.3d 559 (2024). However, a defendant merely being present during the commission of a crime and aware that a crime is in fact occurring in their presence is not enough to establish accomplice liability. *Id.* at 111-12.

The line to establish accomplice liability can be imprecise, but illustrative examples show that an accomplice, at the very minimum, must be aware of their participation in the alleged illegal activity. *See*, *e.g.*, *State v. Martinez*, 105 Wn. App. 775, 786, 20 P.3d 1062 (2001) (holding that defendant could not be criminally liable as an accomplice for driving someone who possessed drugs because there was no evidence they knew or should have known the other person possessed drugs), *overruled in part on other grounds by State v. Rangel-Reyes*, 119 Wn. App. 494, 81 P.3d 157 (2003); *State v. Luna*, 71 Wn. App. 755, 760, 862 P.2d 620 (1993) (holding that defendant could not be held liable as an accomplice because he did not know the principal was going to steal a car until the principal did so). A defendant can cross the line from being a mere bystander or witness to being an accomplice if the defendant knew or should have reasonably known prior to the principal's commission of the alleged crime that the principal intended to commit that particular crime. *See State v. Asaeli*, 150 Wn. App. 543, 569, 573, 208 P.3d 1136 (2009) (holding one defendant was an accomplice because evidence showed that he "was aware [the principal] was armed and prepared to shoot [the victim]" while holding another defendant was not an accomplice because there was only evidence that he "agreed to meet" at the location of the shooting, not that he was aware of the plan to shoot the victim).

28

"Aid" must also be sufficiently related to the alleged crime. *State v. Amezola*, 49 Wn. App. 78, 89, 741 P.2d 1024 (1987), *overruled in part on other grounds by McDonald*, 138 Wn.2d 680. For example, in *Amezola*, we addressed whether accomplice liability could extend to the live-in companion of one of the defendants in a drug distribution operation because she performed domestic tasks in the home. *Id.* at 80, 88-89. The State argued that "her cooking and cleaning enabled the others to deliver the heroin." *Id.* at 89. We held that although the live-in companion's conduct "might have made life easier for those committing the crime," her domestic tasks were insufficient to establish accomplice liability because they were "totally distinct" from the alleged criminal acts. *Id.* We reasoned,

> The mere performance of domestic tasks which, at most, might have made life easier for those committing the crime, is hardly conduct sufficient to expose one to criminal liability. [Her] cooking and cleaning are activities totally distinct from and incidental to the criminal acts charged here. Her connection to the latter is no more than physical presence and assent, both insufficient to establish accomplice liability for possession of a controlled substance with intent to deliver.

*Id.* at 89-90.

B. HOMICIDE BY ABUSE FOR DEATH OF K.R.

Franks argues that there is insufficient evidence to support his conviction for homicide by abuse because Adams ran the household and was responsible for the discipline and withholding of food. Franks characterizes his role in K.R.'s abuse and eventual death as "passive" and insufficient to prove he was an accomplice. We disagree.

A person may be found guilty of homicide by abuse in two ways. The first is if they, while "manifesting an extreme indifference for human life," caused the death of a child as the result of a "pattern or practice" of assaulting that child. RCW 9A.32.055(1). Second, is if they, while

"manifesting an extreme indifference to human life," caused the death of a child as the result of a pattern or practice of torturing that child. *Id.* To prove homicide by abuse, the State must only prove assault *or* torture, it need not prove both. *Madarash*, 116 Wn. App. at 514.

For the purposes of homicide by abuse, "torture" means to cause another person " 'intense suffering,' " " 'anguish,' " or " 'severe pain.' " *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2414 (1969)). Defendants also cannot evade criminal liability by framing their conduct as "discipline." *See*, *e.g.*, *id.* at 515 (holding that defendant's "disciplining" of the victim by locking her in a hot car with blankets on, locking her in her room, and making her wear her soiled underwear on her head amounted to torture).

Here, Franks first argues that the State failed to show that he engaged in a pattern or practice of assaulting or torturing K.R. Referencing the horrific facts of *Madarash*, Franks appears to contend that because his conduct fell short of the defendant's conduct in that case, there was insufficient evidence of assault and torture for the purposes of homicide by abuse. In other words, Franks appears to argue that homicide by abuse requires the extreme level of conduct found in *Madarash*.

We flatly reject the position that starving K.R. to death did not amount to a pattern or practice of torture. When the COVID-19 pandemic ended in-person schooling, K.R.'s health deteriorated, and he transitioned from being an energetic boy who loved to run around and play basketball to a boy who could barely stand and walk upstairs. Still, Franks and Adams continued to deny him sufficient nutrition for his survival. The evidence of a pattern of torture taking place in the household is overwhelming, especially when all inferences are construed in favor of the

State.  Franks' argument that the level of abuse K.R. was subjected to does not rise to the level required for homicide by abuse plainly fails.

But Franks also argues that even if there was sufficient evidence of an ongoing pattern of assault or torture, Adams was solely responsible, not him.  Franks contends that he was never Adams' accomplice; he never aided or encouraged her in hitting K.R. or locking him in his room without meals.  Instead, Franks likens his role to that of the live-in companion in *Amezola* and contends that his role was solely "domestic" and that he was "merely present."  Appellant's Opening Br. at 42, 44.  And, to the extent that he "enforced house rules," his part was "at most a passive [one]."  Appellant's Opening Br. at 39-40.

The State rejects the notion that Franks was merely present, arguing that "Franks' role as a disciplinarian assisted Adams in effectuating K.R.'s starvation."  Br. of Resp't at 33.  The State highlights the ways in which Franks had "input and control" over feeding K.R. and his brothers, including how he would bring the boys food in their room when they were being punished and told them to let him know if they needed more food.  Br. of Resp't at 32.  The State also contends that Franks' "presence and prior demonstrated willingness to assist in the discipline made him an accomplice to Adams' repeated hitting of K.R. for regurgitating food."  Br. of Resp't at 33.  Thus, Franks was more than a passive bystander when it came to the abuse of K.R.

We agree with the State.  Franks described himself as K.R.'s caregiver and was with him every day.  Unlike the live-in companion in *Amezola*, whose actions of merely cooking and cleaning were "totally distinct" from the drug crimes committed by others, Franks' "domestic" position as the stay-at-home dad put him at the center of all of the boys' abuse and K.R.'s eventual death.  49 Wn. App. at 89-90.  In fact, the evidence shows that Franks knew about, and actively

participated in, K.R.'s abuse. K.A. gave testimony that Franks was willing to follow Adams' orders when it came to punishing the boys. K.C. also testified that Franks was the one who installed the lock on the outside of their bedroom door. Franks also personally locked up K.R. and his brothers in their bedroom while nourishment was withheld. And Franks also continued to deprive K.R. of food even as K.R. noticeably lost weight and grew weaker. Even assuming, as Franks claims, that he just went along with what Adams said, the act of being her "puppet" and following her directives to starve K.R. to death shows that he was well aware of his participation and "knowingly aided" the crime. *See Hanley*, 33 Wn. App. at 111. Construing the inferences in favor of the State, there was sufficient evidence to support Franks' liability as an accomplice to Adams.

C. SECOND DEGREE CRIMINAL MISTREATMENT OF K.A. AND K.C.

Franks next argues that there is insufficient evidence to convict him of second degree criminal mistreatment of K.A. and K.C. Franks argues that even if he were to be held liable as an accomplice to Adams' withholding of food, the boys experienced only "reduced energy" as a result, which is insufficient injury for the crime. Appellant's Opening Br. at 50. We disagree.[3]

---

[3] Franks appears to make two additional sufficiency arguments. First, he argues that his "spanking" of the boys was insufficient to rise to the level of conduct required for the crime. Whether or not his "spanking" rises to a sufficient level for the crime, starvation of K.A. and K.C. certainly does, so we do not further address this argument.

Second, Franks reraises his earlier argument for homicide by abuse that there is insufficient evidence to support accomplice liability for criminal mistreatment because it was Adams, not Franks who withheld food from the boys. For the same reason this argument fails for homicide by abuse, it fails for criminal mistreatment—Franks was an active participant in punishing the boys by physically assaulting them and by depriving them food. So we limit our discussion to Franks' argument regarding the character of the injury the mistreatment caused.

Criminal mistreatment is intended to impose criminal liability on parents or caregivers for abusive treatment of children and dependent persons. RCW 9A.42.030; SUBSTITUTE H.B. 1153, at 1, 65th Leg., Reg. Sess. (Wash. 2017). A parent or individual who was "entrusted with the [child's] physical custody" and had the responsibility of providing the child "the basic necessities of life" can be found guilty of second degree criminal mistreatment if they (1) created "an imminent and substantial risk of death or great bodily harm by withholding any of the basic necessities of life" or (2) caused the child "substantial bodily harm by withholding any of the basic necessities of life." RCW 9A.42.030.

The statute defines "great bodily harm" as "physical pain or injury, illness, or an impairment of physical condition" that "creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily part or organ." RCW 9A.41.010(3).

The statute defines "substantial bodily harm" as "physical pain or injury, illness, or an impairment of physical condition" that "involves a temporary or substantial disfigurement or which cause a temporary loss or impairment of the function of a bodily part or organ." RCW 9A.42.010(3).[4]

Here, Franks argues that the State failed to prove that his conduct met these definitions. He appears to liken the boys' symptoms to a post-traumatic stress disorder or a mental impairment,

---

[4] We have previously determined that growth issues resulting from malnourishment can constitute substantial bodily injury. *See*, *e.g.*, *State v. Treblicock*, No. 43950-6-II, slip op. (unpublished portion) at 21-22, https://www.courts.wa.gov/opinions/pdf/D2%2043930-1-II%20%20Part-Published%20Opinion.pdf (explaining that there was sufficient evidence to show substantial bodily injury because as a result of the victim being starved as a form of punishment she was underweight, malnourished, putting her at risk of infection and disease and inhibiting her growth).

which is not sufficient to establish a temporary or permanent *physical* disfigurement. And he also minimizes any physical ailments resulting from the boys' malnutrition because the boys' condition improved while in foster care. As Franks states in his opening brief,

> The State argued the boys could not ride their bikes for long periods of time. But they could still ride a bike. The State argued the boys could not snowboard like other children. But that was the first time they snowboarded and they still could do that activity. The State argued they would get tired walking up stairs at a waterpark. But they could still walk up the stairs.
>
> . . . By all accounts, the boys were still mobile and could still perform day-to-day activities.

Appellant's Opening Br. at 56-57 (footnote omitted). Franks rejects the State's theory that K.C. suffered a physical disfigurement by being unable to grow taller due to lack food, calling it "wholly speculative." Appellant's Opening Br. at 53.

The State responds that there is ample evidence of both "temporary but substantial disfigurement" (substantial bodily harm) and "a temporary but substantial loss or impairment of the function of any bodily part or organ" (great bodily harm). Br. of Resp't at 40. The State points to the testimony by Dr. Copeland that nutritional deprivation caused K.A. and K.C. to be shorter and lighter than they were expected to be, with these effects being permanent for K.C., which the State uses to argue the boys suffered "substantial disfigurement and a substantial loss of impairment of their ability to grow." Br. of Resp't at 41. Further, the State contends that their "extreme emaciation and loss of normal strength and endurance" are sufficient to show "an imminent and substantial risk of death," "an impairment of physical condition" and a "protracted loss or impairment of the function of any bodily part or organ." Br. of Resp't at 41-42.

Especially looking at the evidence in the light most favorable to the State, we agree with the State. There is sufficient evidence, especially with the testimony from Dr. Copeland, to show that Franks' ongoing starvation of K.A. and K.C. constituted both types of injury in the statute—substantial bodily harm and great bodily harm.[5] Thus, there was sufficient evidence to support his convictions of second degree criminal mistreatment of K.A. and K.C.

## III. PROSECUTORIAL MISCONDUCT

For the first time on appeal, Franks argues that the State committed prosecutorial misconduct by misstating the law and suggesting during closing argument that he had a duty as a "dad" to protect K.R., K.C., and K.A. He contends that this misconduct was so prejudicial that it could not have been cured by instruction. We disagree.

"The hurdles to obtaining relief based on prosecutorial misconduct are purposefully high." *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 754, 482 P.3d 971 (2021). We defer to "the trial court's ability to oversee the administration of justice, defense counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case." *Id.*

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d

---

[5] Franks argues that the criminal mistreatment statute is an alternative means statute, which means that the State was required to prove both prongs of great bodily harm and substantial bodily harm. Assuming, without deciding, that second degree criminal mistreatment is an alternative means statute, because we hold that there is sufficient evidence to prove both prongs, our outcome would be the same. *See State v. Sandholm*, 184 Wn.2d 726, 732, 364 P.3d 87 (2015) ("In alternative means cases, where the criminal offense can be committed in more than one way, we have announced a rule that an expression of jury unanimity is not required provided each alternative means presented to the jury is supported by sufficient evidence.").

653 (2012). Generally, we first evaluate whether the prosecutor's conduct was improper. *Id.* at 759. If the prosecutor's conduct was improper, we then determine if the conduct prejudiced the defendant. *Id.* at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.*

The prosecutor is given wide latitude to assert reasonable inferences from the evidence. *State v. Crossguns*, 199 Wn.2d 282, 296-97, 505 P.3d 529 (2022). But a misstatement of the law by the prosecutor is improper. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015).

If a prosecutor's alleged misconduct occurs in closing argument, we examine the conduct given " 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

Here, Franks argues that the State misstated the law during its rebuttal when the prosecutor told the jury,

> And [Franks] does have a duty here. He's dad. He tells you that in his own testimony. Actions speak louder than words. Crying on the stand, claiming that you cared three years after the fact when you are on the hook for murder does not negate your actions.

13 VRP at 2399. Specifically taking issue with the prosecutor's statement that he had a "duty" to K.R., K.A., and K.C. and linking that "duty" to being "dad," Franks argues that these comments were a misstatement of the law. Citing *State v. Jackson*, he contends that a parent cannot be held criminally liable for their failure to intervene or protect their child from abuse. 137 Wn.2d 712, 976 P.2d 1229 (1999).

In *Jackson*, our Supreme Court held that a parent's failure to fulfill their duty of care and to protect their child from the abuse of another was not a crime and could not open them up to criminal liability for assault or criminal mistreatment. *Id.* at 715. The court explained that parents have a duty to protect their children, the breach of which could result in civil consequences, such as termination of their parental rights. But the breach of this duty is not itself a crime. *Id.* at 721.

According to Franks, when the prosecutor said that Franks had a "duty" to the boys as "dad," the jury was misled and, contrary to *Jackson*, thought that Franks could be held criminally liable for breaching his duty as a parent to protect the children. He asserts that this statement was especially prejudicial because it affected Franks' multiple charges against multiple victims.

We disagree that the statements were improper. Looking at the full context of the entire argument, the prosecutor's mention of Franks' "duty" cannot be construed to mean that Franks should be criminally liable for *failing* to act—at every turn, the prosecutor asserted that Franks was liable for his direct participation in the boys' abuse. The State expressly highlighted how, even though much of the testimony was about Adams, Franks took an active role too. He "hit them," "[h]e locked their door," and "[h]e followed [Adams'] directives or rules or whatever to prevent them from eating freely." 13 VRP at 2400.

Instead, the word "duty" singled out by Franks appears to reference something else entirely. The use of the word appears to have been done in response to Franks' argument that he did not commit criminal mistreatment because he had not "assumed the responsibility to provide [them]

37

the basic necessities of life" as required by the statute.[6] 12 VRP at 2267. In this context, the reference is to Franks' general role of responsibility for the children, rather than a duty in the legal, criminal sense discussed in *Jackson*. Viewed this way, the prosecutor's statements were not a statement of the law (much less a misstatement). Franks' prosecutorial misconduct claim fails.

IV. MENTAL HEALTH EVALUATION

Franks argues that the trial court abused its discretion when it ordered him to undergo a mental health evaluation at sentencing without "reasonable grounds" for doing so as required by RCW 9.94B.080. Franks contends that "there was no evidence that a qualifying mental disease contributed to the alleged crimes." Appellant's Opening Br. at 67. The State concedes that the trial court exceeded its authority and requests that the issue be remanded for a determination of whether a mental health evaluation should be ordered.

Under, RCW 9.94B.080, before ordering a mental health evaluation for a criminal defendant, the trial court must have reasonable grounds to believe that the defendant has a qualifying mental illness or defect that likely influenced their commission of their crimes. These grounds can include information from documents such as a presentence report, competency evaluations, or any other mental status evaluations. RCW 9.94B.080.

---

[6] As noted above, just prior to State's rebuttal, Franks' counsel argued that the State could not prove criminal mistreatment of K.A. and K.C. because he was not responsible for providing for the boys, stating "there's no evidence, and that's what you have to base your decisions on, that he assumed the responsibility to do other things other than give them extra food." 13 VRP at 2359-60.

We accept the State's concession and agree that the trial court erred. We remand to the trial court to determine, consistent with this opinion, whether the mental health evaluation should have been ordered or whether it must be struck.

## V. LIFETIME NO-CONTACT ORDER

Franks argues that the trial court erred by imposing a lifetime no-contact order prohibiting his contact with K.C. and K.A. Franks contends that the no-contact order violates his constitutional rights as a parent " 'to the care, custody, and companionship of [his] children.' " Appellant's Opening Br. at 67-68 (quoting *State v. Reedy*, 26 Wn. App. 2d 379, 392, 527 P.3d 156 (internal quotation marks omitted), *review denied*, 1 Wn.3d 1029 (2023)). Although he is not the boys' biological or adoptive father, Franks contends that he has parental rights because "the State argued, and substantial evidence was presented, that [he] was the boys' father." Appellant's Opening Br. at 71.

We disagree that the no-contact order violates Franks' constitutional right to parent. It is undisputed that Franks is neither the biological nor adoptive father of K.C. and K.A. And Franks cites no law to support the contention that individuals who are not legally a minor's parents are nevertheless entitled to parental rights. *See DeHeer*, 60 Wn.2d at 126 ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). The trial court did not err.

CONCLUSION

We affirm Franks' convictions and no-contact order, but we remand for further proceedings regarding the order for a mental health evaluation.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

LEE, J.